**Marquis Aurbach Coffing**
Terry A. Coffing, Esq.
Nevada Bar No. 4949
10001 Park Run Drive
Las Vegas, Nevada 89145
Telephone: (702) 382-0711
Facsimile: (702) 382-5816
tcoffing@maclaw.com
Attorneys for Respondent Regal Securities, Inc.

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

JAY HU,

                  Petitioner,

vs.

REGAL SECURITIES, INC.,

                  Respondent.

Case Number:
2:19-cv-01930-KJD-NJK

**RESPONDENT REGAL SECURITIES, INC.'S RESPONSE TO MOTION TO VACATE ARBITRATION AWARD**

Respondent Regal Securities, Inc. (Regal),[1] by and through their attorneys of record, the law firm of Marquis Aurbach Coffing, hereby submit their Repose to Motion to Vacate Arbitration Award. This Response is made and based upon all papers, pleadings, and records on file herein, the attached Memorandum of Points and Authorities, and any oral argument allowed at a hearing on this matter.

## MEMORANDUM OF POINTS & AUTHORITIES

### I.    INTRODUCTION[2]

Although petitioner Jay Hu paints himself as an innocent, amateur investor, the facts presented to the FINRA arbitrators, and now before the Court, show he is anything but.

---

[1] Regal has never been served with Hu's motion. *See* Declaration of Terry A. Coffing, Esq., attached as **Exhibit A**, ¶ 23. In fact, upon learning of the motion, Regal offered to accept service of the motion, but Hu never replied or provided an acceptance of service. **Ex. A** ¶ 23. Nonetheless, Regal hereby opposes the motion.

[2] At the outset, it bears noting that, although Hu's motion contains nearly 38 pages of text and roughly 350 pages of exhibits, it includes no evidence, either documentary or testimonial, to support any of Hu's contentions regarding the arbitration at issue here. As a result, Hu has failed to present proper points and authorities to support his motion and, therefore, consents to this Court's denial of the same. *See* Local Rule 7-2(d).

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

Having been presented with an accurate depiction of the facts surrounding Hu's extensive trading background and his highly speculative trades, the FINRA arbitrators unanimously awarded Regal $265,338.43, plus interest, attorney fees, costs, and sanctions (the Award).[3]

Despite Hu's representations to the contrary, when Hu opened his self-directed trading account with eOption,[4] a division of Regal, he indicated that he had over a decade of investment experience, a high net worth and annual income, worked as a statistician for a living, marked that his investment objectives were speculation and high risk, and desired to engage the highest risk level of option trading available at eOption. His account transfer paperwork, which showed he had been trading a large option position at another brokerage firm, confirmed his experience.

Hu engaged in a strategy at eOption—and other firms—where he was selling uncovered put options. This strategy relies on collecting cash premiums for selling options that have a high probability of expiring worthless. The risk was that if the security went down, there was a fixed obligation to buy the security at higher prices than the current market. It is considered a high risk and speculative strategy, which is what Hu desired and was consistent with his account paperwork objectives and previous experience. The most this strategy can earn is the option premium received at time of the initial sale. However, the risk is that the underlying security could go down, even to zero, creating substantial losses. In the five months Hu was engaging in this strategy at eOption, he enjoyed over $64,000 in premiums. Selling uncovered puts can be profitable in a low volatility market environment, where the investor expects the underlying security to stay flat or increase, and the option

---

[3] More specifically, FINRA arbitrator awarded Regal Securities $265,338.43; 5.0% annual interest from March 15, 2018 until the $265,338.43 is paid in full; $43,000 in attorneys' fees pursuant to the underlying agreements; and $23,000 in sanctions pursuant to a prior FINRA order. *See* FINRA Office of Dispute Resolution Award, attached as **Exhibit B**, at 4.

[4] eOption provides a more complete description of its relationship to Regal on its website, https://www.eoption.com/company/.

MAC:15872-001 Opposition to #1 Jay Hu_s Motion to Vacate Arbitration Award 12/30/2019 3:10 PM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

expires worthless. Since the market enjoyed a low volatility environment for quite some time, Hu's strategy was, for many months, very profitable.

However, as with any trade, there are market risks. On February 5, 2018, there was a volatility spike in the market, which caused Hu's position to move substantially against him—the underlying security fell over 80% in the after-hours market that day causing the puts he was short to substantially increase in value, creating large losses for Hu.  Because the spike happened suddenly, after hours, there was virtually no opportunity to mitigate the loss, because options do not trade in the after-hours market. From the time of the close on February 5 through February 7, eOption's Risk Management Department was in constant communication with Hu; nonetheless, Hu incurred a substantial loss.

In accordance with the margin agreement that Hu signed, Hu now had an obligation to meet the equity level above the maintenance margin requirement. Because Hu would not commit to sending in funds to meet his obligation, eOption's risk manager started using the cash in his account to mitigate Hu's substantial losses. All of eOption's actions in regards to this mitigation were outlined in the margin agreement, and were designed to protect both the client and the firm.

Despite this, rather than paying Regal the approximately $265,000 he owed them, Hu sued Regal, which initiated the underlying FINRA arbitration. During the arbitration, Hu repeatedly stonewalled Regal's attempts at discovery, for which he was alter sanctioned. After Hu finally provided Regal the requested documents, it came to light that Hu was defending a different FINRA arbitration, against a different broker, based on the exact same conduct, for which he owed over $374,000.

Hu then began lodging identical bias complaints in both arbitrations, which he repeats now, which have proven to be meritless. As detailed below, not only did the head of FINRA arbitration, Rick Berry, rule that there was no bias in this case, but each of the 3 panelists also made the decision that they were not biased and were in the position to proceed with the arbitration hearing.

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

Thus, Hu provides no basis for this Court to vacate the Award. Hu cannot demonstrate the Award was procured by undue means; that there was evident partiality among the arbitrators; that the arbitrators were guilty of misconduct; or that the arbitrators exceeded their powers in issuing the award. Therefore, this Court should (1) deny Hu's motion, (2) reduce the FINRA arbitration to judgment, and (3) award Regal its reasonable attorney fees and costs incurred opposing Hu's motion pursuant to Nev. Rev. Stat. § 38.243(3).

## II.   STATEMENT OF FACTS

Hu's motion relies almost entirely on news articles and pleas for pity based on Hu's proper person filing status rather than providing an accurate depiction of his trading history and experience. ECF No. 1 at 2-21. However, Hu's trading history demonstrates that, rather than an unwitting customer whose "life-savings were wiped out due to horrible negligence by Regal," ECF No. 1 at 2, Hu was, instead, an experienced trader who knowingly borrowed money to take trading positions that carried infinite risk and, because of an after-hours spike in market volatility, incurred a massive debt to Regal.[5]

### A.   HU IS AN EXPERIENCED, HIGH-NET-WORTH TRADER.

#### 1.   Hu's background.

In August 2017, Hu, a long-time statistician and owner of a statistical analysis company, opened an individual trading account at eOption, an online discount trading division of Regal. *See* Declaration of Gina Bokios, Esq., attached as **Exhibit C**, ¶ 3. As such, the account was self-directed by Hu, and all of the trades were unsolicited—which means that Hu made all of his investment decisions entirely of his own accord with no recommendations from eOption. **Ex. C ¶** 3. There was no broker or investment advisor

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

---

[5] Hu also utilized this strategy at other brokerages, including Charles Schwab, that also resulted Hu incurring massive debts to those brokerages. *See* Charles Schwab FINRA arbitration award, attached as **Exhibit D**; Judgment confirming Charles Schwab's arbitration award, attached as **Exhibit E**.

associated with his account, and Hu entered all of his orders himself through eOption's online web-based platform. **Ex. C** ¶ 3.

### a.   Hu's new account application.

In Hu's new account paperwork, for his investment experience, he marked "10+ years" for Stocks, and "10+ years" for Options.[6] *See* New Account Application, attached as **Exhibit F**, at 2.   Additionally, Hu indicated that his annual income is "$100,000 - $249,999," that his net worth (exclusive of his residence) is $1,000,000 - $3,000,000 and that his liquid net worth is $500,000 - $999,999. **Ex. F** at 2.   Hu also indicated that "the

---

[6] The documents Hu signed with Regal include an arbitration agreement that states, in relevant part:

By signing an arbitration agreement, the parties agree as follows:

- ALL PARTIES TO THIS AGREEMENT ARE GIVING UP THE RIGHT TO SUE EACH OTHER IN COURT, INCLUDING THE RIGHT TO A TRIAL BY JURY, EXCEPT AS PROVIDED BY THE RULES OF THE ARBITRATION FORUM IN WHICH A CLAIM IS FILED.

- ARBITRATION AWARDS ARE GENERALLY FINAL AND BINDING. A PARTY'S ABILITY TO HAVE A COURT REVERSE OR MODIFY AN ARBITRATION AWARD IS VERY LIMITED.

. . .

- THE ARBITRATORS DO NOT HAVE TO EXPLAIN THE REASON(S) FOR THEIR AWARD.

- THE PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES INDUSTRY.

. . .

[Hu] AGREES AND, BY CARRYING AN ACCOUNT FOR THE CUSTOMER, [Regal] AGREES, THAT ALL CONTROVERSIES THAT MAY ARISE AMONG [Hu], [and] [Regal] . . . CONCERNING ANY TRANSACTION OR THE CONSTRUCTION, PERFORMANCE, OR BREACH OF THIS OR ANY OTHER AGREEMENT AMONG [Hu], [and] [Regal] . . . PERTAINING   TO   SECURITIES . . . SHALL   BE DETERMINED BY ARBITRATION.

**Ex. F** § 42.

MAC:15872-001 Opposition to #1 Jay Hu_s Motion to Vacate Arbitration Award 12/30/2019 3:10 PM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

investments in this account will be 1/3 of [his] financial portfolio," which indicated to Regal that his investments did not represent his "life savings," as he now claims in his motion. *Compare* **Ex. F** at 3, *with* ECF No. 1 at 2. Hu also indicated "[m]arket speculation" was his investment objective, **Ex. F** at 3, and that his risk tolerance was "[h]igh," **Ex. F** at 2, both of which are the highest and most aggressive categories on the application.

Hu's option account application also supports his years of investment experience and desire for speculation. **Ex. F** at 2–3. In doing so, Hu again he requested the highest level of options trading available at eOption, and further indicated his high income, net worth, years of investment experience, and desire for speculation. **Ex. F** at 2–3. Indeed, Hu again marked the most speculative and aggressive trading boxes. **Ex. F** at 2–3. Under Investment Objective, Hu marked the most aggressive objective, "[s]peculation," and when indicating what his "[p]rior [o]ption [a]ctivity [h]as [b]een," he marked "[u]ncovered (sales)," again, the most speculative category, and for "[p]rior [o]ption [t]rading [f]requency," Hu indicated he was "[a]ctive," the highest category. **Ex. F** at 4. Under "[p]rior [o]ption [t]rading [o]ccurred in [w]hat [a]ccount [t]ype," Hu indicated he had traded options using "[b]oth" cash and margin. **Ex. F** at 2. Out of eight possible boxes he can mark for "I plan to use this account for the following (Check all that apply)," Hu marked only one box, again for the most aggressive category, "[m]arket speculation." **Ex. F** at 4. Additionally, under "[c]ustomer [f]inancial [i]nformation," Hu indicated he had "10+ years" of investment experience with stocks and "10+ years" with options. **Ex. F** at 2. Finally, not only did Hu mark the most speculative category on every entry on his option application, he also applied to trade "Level 4" option trading permission, which is the highest, most speculative level of option trading available at eOption. **Ex. F** at 4.

### b. The margin disclosure statement.

Hu also signed paperwork to open a margin account at eOption. **Ex. F** at 13. The margin disclosure statement states the risks of purchasing securities on margin and provides, in relevant part:

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

This statement is being furnished to you to provide some basic facts about purchasing securities on margin, and to alert you to the risks involved with trading securities in a margin account. <u>Before trading stocks in a margin account, you should carefully review the Margin Agreement provided by [Regal]</u>.

. . . When you purchase securities, you may pay for the securities in full or you may borrow part of the purchase price from [Regal's clearing firm]. If you choose to borrow funds, a margin account will be opened. The securities purchased are collateral for the loan to you. <u>If the securities in your account decline in value, so does the value of the collateral supporting your loan, and, as a result, [Regal's clearing firm] or [Regal] can take action, such as issue a margin call and/or sell securities or other assets in any of your accounts held with [Regal's clearing firm], in order to maintain the required equity in the account. It is important that you fully understand the risks involved in trading securities on margin.</u>

**Ex. F** at 13 (emphasis added).

The margin disclosure statement then, explicitly, provides the client with a list of potential risks, including:

• <u>You can lose more funds than you deposit in the margin account. A decline in the value of securities that are purchased on margin may require you to provide additional funds to [Regal's clearing firm] to avoid the forced sale of those securities or other securities or assets in your account(s).</u>

• <u>[Regal] . . . can force the sale of securities or other assets in your account(s). If the equity in your account falls below the maintenance margin requirements or [Regal's clearing firm]'s higher "house" requirements . . . [Regal] can sell the securities or other assets in any of your accounts held at [Regal's clearing firm] to cover the margin deficiency. You also will be responsible for any shortfall in the account after such a sale.</u>

• <u>Your securities or other assets may be sold without contacting you.</u> . . . This is not the case . . . . the firm can still take necessary steps to protect their financial interests, including immediately selling the securities without notice to the customer.

• You are not entitled to choose which securities or other assets in your account(s) are liquidated or sold to meet a margin call. Because the securities are collateral for the margin loan, . . . . [Regal] has the right to decide which security to sell in order to protect [Regal's clearing firm]'s interests.

• <u>"House" maintenance margin requirements may be increased at any time without advance written notice. These changes in [Regal's clearing firm]'s policy often take effect immediately and may result in the issuance of a maintenance margin call.</u> Your failure to satisfy the call may cause [Regal's clearing firm] or [Regal] to liquidate or sell securities in your account(s).

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    • <u>You are not entitled to an extension of time on a margin call</u>. While an
2    extension of time to meet margin requirements may be available to customers
     under certain conditions, a customer does not have a right to the extension.

3    **Ex. F** at 13 (emphasis added).

4         Thus, the margin disclosure statement put Hu on notice of the risks of trading on

5    margin. The margin disclosure statement warns that, as occurred here, "[y]ou can lose more

6    funds than you deposit in the margin account." **Ex. F** at 13.  Further, the margin disclosure

7    statement clearly states that Regal can force the sale of securities or other assets in Hu's

8    accounts if the account falls below the higher maintenance "house" requirements to cover

9    any margin deficiency. **Ex. F** at 13. The language also states that Hu will be responsible for

10   any shortfall in the account after such a forced sale.

               **c.      The special statement for uncovered option writers.**

12        Hu also received a special statement for uncovered option writers when he opened

13   his option trading account at eOption.  *See* Special Statement for Uncovered Option Writers,

14   attached as **Exhibit G**. As detailed below, the disclosure clearly states that "the risk of

15   writing uncovered put options is substantial," and that eOption may request "significant

16   additional margin payments" if "the value of the underlying instrument moves against an

17   uncovered writer's options position." **Ex. G**.  Further, the disclosure warns that "[i]f an

18   investor will not make" these additional payments, then eOption has the right to liquidate the

19   positions in his account.  **Ex. G**.

20        The margin disclosure statement further provides:

21   There are special risks associated with uncovered option writing, which
     expose the investor to potentially significant loss. Therefore, this type of
22   strategy may not be suitable for all customers approved for options
     transactions.
23

24        1. The potential loss of uncovered call writing is unlimited. The writer
     of an uncovered call is in an extremely risky position, and may incur large
25   losses if the value of the underlying instrument increases above the exercise
     price.

26        2. As with writing uncovered calls, <u>the risk of writing uncovered put</u>
     <u>options is substantial. The writer of an uncovered put option bears a risk of</u>
27   <u>loss if the value of the underlying instrument declines below the exercise</u>

price. Such loss could be substantial if there is a significant decline in the value of the underlying instrument.

3.   Uncovered option writing is thus suitable <u>only for the knowledgeable investor who understands the risks, has the financial capacity and willingness to incur potentially substantial losses, and has sufficient liquid assets to meet applicable margin requirements. In this regard, if the value of the underlying instrument moves against an uncovered writer's options position, the investor's broker may request significant additional margin payments. If an investor does not make such margin payments, the broker may liquidate stock or options positions in the investor's account, with little or no prior notice in accordance with the investor's margin agreement.</u>

4. For combination writing, where the investor writes both a put and a call on the same underlying instrument, the potential risk is unlimited.

5.   If a secondary market in options were to become unavailable, investors could not engage in closing transactions, and an option writer would remain obligated until expiration or assignment.

6. <u>The writer of an American-style option is subject to being assigned an exercise at any time after he has written the option until the option expires.</u> By contrast, the writer of a European-style option is subject to exercise assignment only during the exercise period.

NOTE:   It is expected that you will read the booklet entitled CHARACTERISTICS AND RISKS OF STANDARDIZED OPTIONS available from your broker. In particular your attention is directed to the chapter entitled Risks of Buying and Writing Options. This statement is not intended to enumerate all of the risks entailed in writing uncovered options.

**Ex. F** (emphasis added).

        **d.**        **The options disclosure document.**

Not only were the risks of selling naked puts and margin outlined in Regal's option account application and margin agreement, but, on August 24, 2017, Hu also received a 188-page options disclosure document entitled "Characteristics and Risks of Standardized Options" when he opened his option trading account at eOption, which detailed many of the risks of trading various option strategies.[7] **Ex. C ¶ 4.**

The options disclosure document has an entire section entitled "Principal Risks of Option Holders" which has 30 pages describing risks and examples of various option trading

---

[7] The options disclosure document is available, in full, at https://www.theocc.com/about/publications/character-risks.jsp.

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

positions.  *See* Options Disclosure Document, relevant portions of which are attached as **Exhibit H**. Under the Section "RISKS OF OPTION WRITERS," it clearly lays out the risks of Hu's strategy—writing put options.   In relevant part, the options disclosure document states:

> As with writing uncovered calls, the risk of writing put options is substantial. The writer of a put option bears a risk of loss if the value of the underlying interest declines below the exercise price, and such loss could be substantial if the decline is significant. The writer of a put bears the risk of decline in the price of the underlying interest – potentially to zero. A put writer of a physical delivery option who is assigned an exercise must purchase the underlying interest at the exercise price – which could be substantially greater than the current market price of the underlying interest – and a put writer of a cash- settled option must pay a cash settlement amount which reflects the decline in the value of the underlying interest below the exercise price. Unless the put is secured (as discussed below), its writer is required to maintain margin with a brokerage firm.

*See* **Ex. H** at 64. (emphasis added).

The options disclosure document further states:

> The obligation of a writer of an uncovered call or of a put that is not cash-secured to meet applicable margin requirements may create additional risks. If the value of the underlying interest moves against the writer's position, or if there is a significant change in the volatility or liquidity of the underlying interest, related interests, or the option, or if the writer's brokerage firm otherwise requires, the firm may request significant additional margin payments. If those payments are not made, the firm may have the right to liquidate the options positions and other securities positions in the writer's account with little or no prior notice.

**Ex. H** at 65 (emphasis added).

The options disclosure document also informs the option writer of his obligations when, as would soon be the case with Hu, a trading market becomes unavailable or there is a sudden development that causes a sharp downward spike in the value of the underlying stock: "If a trading market in an option should become unavailable, or if the writers of the option are otherwise unavailable to engage in closing transactions, the writers of that option would remain obligated until expiration or assignment." **Ex. H** at 67. Additionally, the options disclosure document provides that "[a] sudden development may cause a sharp upward or downward spike in the value of the interest underlying a capped option. Such a

spike could cause the capped option to be automatically exercised, and writers of the option to become obligated to pay the cash settlement amount." **Ex. H** at 67.

Finally, the options disclosure document warns that

> [d]isruptions in the markets for underlying interests could result in losses for options investors. Each of the options markets has discretion to halt trading in an option in certain circumstances – such as when the market determines that the halt would be advisable in maintaining a fair and orderly market in the option. If trading is halted or suspended in one or more markets for an underlying interest, the trading of markets on that interest may be halted. Similarly, if dissemination of the current level of an underlying index is interrupted, or if trading is interrupted in stocks accounting for a substantial portion of the value of an index, the trading of options on that index may be halted

In such an event, "[w]hen trading in an option is halted or suspended, holders and writers of that option will be unable to close out their positions until trading resumes, and they may be faced with substantial losses if the value of the underlying interest moves adversely during that time."

**Ex. H** at 70.

### 2.   Regal's screening process.

eOption has a standard process for reviewing and approving option trading requests. **Ex. C** ¶ 5. Each option application is carefully reviewed to determine if the client has the necessary qualifications, experience and resources to trade options, and at what level. **Ex. C** ¶ 5. Factors that are considered are age, income, employment, investment objectives, investment experience, and financial assets. **Ex. C** ¶ 5.

After reviewing Hu's new account paperwork and option application, the firm determined that Hu had the adequate high income, high net worth of over a million dollars, over a decade of options trading experience, the highest risk tolerance, and the most speculative trading objective to engage in a "Level 4" trading strategy in his self-directed, unsolicited trading account at eOption. **Ex. C** ¶ 6.

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

### 3.   Hu's trading strategy.

As an experienced, high-net-worth trader, Hu engaged in a very speculative strategy of selling uncovered puts.[8] **Ex. C ¶ 7.**  This strategy involves selling put options for cash premiums with limited reserved cash on hand to purchase the underlying stock, if it became necessary. **Ex. C ¶ 7.**  Importantly, Hu's strategy also relies on a steady or rising stock price—as opposed to a declining stock price—that causes the option to expire worthless. **Ex. C ¶ 7.** This is considered a highly speculative strategy, and an unfavorable market move downward could cause the investor to have to post additional margin or liquidate their position at a substantial loss.  **Ex. C ¶ 7.**  Hu utilized this strategy, apparently successfully for a period of time, until the market went significantly against him in early February. **Ex. C ¶ 7.**

## B.   BACKGROUND OF THE TRADES AT ISSUE.

### 1.   Hu entered into a speculative option strategy where he collected income in a low volatility market environment.

Hu engaged in a high risk, speculative pattern of option trading that took advantage of a low volatility market environment that worked successfully for him from 2017 through early February 2018. **Ex. C ¶ 8.**  Upon information and belief, he was most likely utilizing the same strategy at several other discount brokerage firms, including, among others, Charles Schwab. **Ex. C ¶ 8; Ex. D** ("[Charles Schwab] alleged [Hu] breached his contractual obligation to satisfy the unsecured debit balance in his Schwab One account. The causes of action relate to the liquidation of [Hu]'s position in the exchange traded fund product ProShares Short VIX Short-Term Futures ("SVXY")).

Specifically as to Hu's strategy, he was engaging in a "Level 4" speculative options strategy, which involved selling uncovered puts on the underlying security, SVXY, to collect premium, but which also obligates him to buy SVXY shares at the strike price he

---

[8]  By Hu's own admission, he arrived at this strategy after using a complex correlation analysis. See ECF No. 1 at 23-24.

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711  FAX: (702) 382-5816

sold the options at (if the market price of SVXY falls below the strike price). **Ex. C ¶ 10.** SVXY is an exchange traded fund (ETF) that seeks daily investment results, before fees and expenses, that correspond to one times the inverse (-1x) of the daily performance of the S&P 500 VIX Short-Term Futures Index. Hu's maximum gain was the premium earned when he initially sold the option, and his maximum loss would occur if SVXY shares fell to zero. **Ex. C ¶ 10.**

By selling uncovered puts on SVXY, Hu's goal was to have the options expire worthless while he kept the put sale proceeds and enjoyed a stream of income. **Ex. C ¶ 11.** For the five months his trading account was at eOption—from September 2017 through early February 2018—Hu earned $64,306.47 in option premiums by selling these uncovered puts. **Ex. C ¶ 11.** He also was doing this exact same strategy at his previous brokerage firm, OptionsHouse, and upon information and belief, his option premiums earned there were significant. **Ex. C ¶ 11.** Hu was profitable in the low volatility market that existed for quite some time by engaging in this strategy at various discount brokerage firms. **Ex. C ¶ 11.**

2. **When there was a big spike in market volatility in the after-hours market on February 5, Hu's option positions moved against him, and eOption had to sell him out to cover his margin call.**

By selling uncovered puts on SVXY, Hu was predicting that the underlying security, SVXY, would either remain flat or go up. **Ex. C ¶ 12.** On January 31, 2018, SVXY closed at a price of $118.11. **Ex. C ¶ 12.** By February 2, the security closed at $105.60. **Ex. C ¶ 12.** On Monday, February 5, the overall market declined even more and SVXY closed at $71.82. **Ex. C ¶ 12.** During market hours on February 5, Mr, Hu continued to sell more uncovered puts on SVXY to collect even more premium. **Ex. C ¶ 12.** In the after-hours market on February 5, the market experienced a tremendous volatility spike that resulted in the underlying security, SVXY, substantially falling in value. **Ex. C ¶ 12.** When SVXY closed on February 5 at a price of $71.82, Hu was not in a margin call situation at the market

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

close.[9] **Ex. C** ¶ 12. A margin call would have been triggered in Hu's account when SVXY reached a price of approximately $47.05. **Ex. C** ¶ 12. However, in after-hours trading that day, due to extreme market volatility, the stock plunged to as low as $11.00, which placed Hu in a substantial margin call that required additional funds to be deposited. **Ex. C** ¶ 12. eOption's risk manager phoned Hu after the close on Monday, February 5 to inform him of the after-hours drop in price. **Ex. C** ¶ 12.

Hu was short a total of 102 uncovered puts on SVXY, and unfortunately, options do not trade in the after-hours market, and thus there was no opportunity for Hu to cover (i.e. buy back) his option positions on SVXY.[10] **Ex. C** ¶ 13. When the price of SVXY fell below $47.05 in the after-hours market, Hu was in a margin call. **Ex. C** ¶ 13.

When the market opened on February 6, 2018, SVXY was temporarily halted and opened hours after most stocks that day, at a price of $11.70 (which was down more than 80%, or $60.12 from the previous close of $71.82/share). **Ex. C** ¶ 14. eOption's Risk Management Department bought to cover 64 short puts on SVXY and covered a small position on VXX6 at a total cost of $457,605.96—which was the amount of cash that Hu had in his account. **Ex. C** ¶ 14. In accordance with the Margin Agreement, the firm's Risk Management Department used this balance to cover a portion of the amount he owed, but there was still a remaining amount due. **Ex. C** ¶ 14. Also, 5 puts were assigned to Hu that evening on February 6 that were "deep in the money." **Ex. C** ¶ 14.

A "deep in the money" option has an exercise, or strike price, significantly above (for a put option) the market price of the underlying security, SVXY. **Ex. C** ¶ 15. Thus, since Hu was assigned 5 "deep in the money" puts that day, he had to purchase 500 shares of SVXY at $70/share, for a total cost of $35,009.00. **Ex. C** ¶ 15. On the evening of

---

[9] A margin call is a demand by a broker that an investor deposit further cash or securities to cover possible losses. *See, e.g.*, https://www.investopedia.com/terms/m/margincall.asp.

[10] To cover a position means to reduce exposure, which, in this case, meant Hu was required to supply additional funds to reduce his exposure to the large losses his positions were incurring. *See, e.g.*, https://www.investopedia.com/terms/c/cover.asp.

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

Wednesday, February 7, Hu was assigned on another 26 puts (where he had to buy 2600 shares of SVXY) at an expenditure of $228,027.00 (for the breakdown, he bought 1300 shares at $85, 1200 shares at $90, and 100 shares at $95). **Ex. C ¶ 15**. This still left Hu's account with a long position of 3,100 shares of SVXY and short 7 SVXY naked puts. **Ex. C ¶ 15**.

On Thursday, February 15, eOption's Risk Management Department ultimately liquidated the remaining positions. **Ex. C ¶ 16**. At that time, eOption sold 3,100 shares of SVXY for approximately $39,990.00 and bought to cover the remaining 7 short puts for approximately $40,044.00. **Ex. C ¶ 16**. However, there was not enough to cover his entire balance, resulting in a shortfall in Hu's account of -$264,603.77. **Ex. C ¶ 16**. To this day, Hu has not paid this amount he owes to eOption and, as a result, this was the principal amount successfully recovered by Regal in the FINRA arbitration. *See* **Ex. B**.

### 3.   eOption's Risk Management Department worked diligently with Hu to mitigate the risks in his account.

After the close on February 5, when eOption's Risk Management Department saw the tremendous volatility spike in SVXY in the after-hours market, they communicated with Hu on a continual basis during this period. *See* April 6, 2018, emails, attached as **Exhibit I**. Hu asked that eOption not liquidate his positions since he thought the price decline was temporary. **Ex. C ¶ 17**. Hu said he needed a week or two to come up with funds to deposit to meet any shortfall, which gave a clear message to eOption that he was not going to meet his margin call in a timely manner. **Ex. C ¶ 17**. eOption informed Hu that the firm was unable to wait that long and may need to act by the following morning. **Ex. C ¶ 17**. The Risk Management Department weighed the risks and made the evaluation that they could not wait to cover the positions in the account. **Ex. C ¶ 17**. After extensive discussions with Hu about the state of his account on February 5 and 6, the Risk Management Department determined that Hu was unable to deliver funds in a timely fashion to maintain the positions as he requested. **Ex. C ¶ 17**.

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

### 4.   eOption acted in accordance with the Margin Agreement.

All of the Risk Management Department's subsequent actions were in accordance with the Margin Agreement, which allowed Hu to use credit against his equity. **Ex. F.** Since his naked puts were deeply in the money, Hu now had a margin call, and he was required to provide additional funds to cover it. **Ex. C ¶ 13.**

On Tuesday, February 6, eOption called and emailed Hu eight times to communicate the state of his account. Exhibit B. As stated earlier, SVXY halted in trading, and eventually opened on February 6 at $11.70 per share. **Ex. C ¶ 16.** At this price, Hu's account was in a state where he was negative equity, meaning his funds were not sufficient to meet the value of the overall account by approximately -$265,338.43. **Ex. C ¶ 16; Ex. I.**

eOption was in constant communication with Hu to determine if he intended to send in funds to cover his shortfall. **Ex. C ¶ 17.** Hu would not commit to sending in additional funds, which resulting in eOption being required to take action immediately to mitigate the risk to the firm. **Ex. C ¶ 17.** It was Hu's stated belief was that SVXY would recover at some point and he would no longer be in a negative equity situation. **Ex. C ¶ 17.** That was not the case.

On February 6, in accordance with the Margin Agreement, the Risk Management Department used the cash in Hu's account to cover a portion of his debt; however, there were not enough funds to cover the entire amount he owed. **Ex. C ¶ 18.** Because Hu was now long SVXY stock, the Risk Management Department started selling the stock positions to generate more cash. **Ex. C ¶ 18.** Because there were not enough funds in his account to buy all the shares that Mr. was obligated to pay for, eOption told Hu that his account was still underwater by approximately $265,338.43, and he had to promptly send these funds to eOption in accordance with the Margin Agreement he previously signed. **Ex. C ¶ 18.** However, Hu has refused to send in any additional funds to cover his debt. **Ex. C ¶ 18.**

MAC:15872-001 Opposition to #1 Jay Hu_s Motion to Vacate Arbitration Award 12/30/2019 3:10 PM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

**5.** **eOption had controls in place prior to February 5 that reduced Hu's risk exposure.**

    **a.**    **eOption significantly increased the margin requirements on Hu's position.**

Although eOption had no duty of suitability in Hu's self-directed account, where eOption made no trading recommendations and he was charged just a few dollars in commissions per trade, eOption did take measures to monitor and restrict Hu's trading in options in SVXY, which ultimately saved him a substantial sum of money. Indeed, eOption implemented higher restrictions on Hu's trading, which he ironically fought.  Had Hu been allowed to engage in the trading he desired to do, his losses would have been in millions of dollars.

eOption increased the margin requirements on SVXY trading in the fall of 2017, which had the effect of significantly reducing the leverage Hu could use to trade these options in his account. Previously, eOption's clearing firm required 10-20% equity of the underlying security in the account to short uncovered puts. **Ex. C** ¶ 20.  However, eOption made the determination to significantly increase the equity requirement on shorting SVXY puts, requiring 50%. **Ex. C** ¶ 20.

Depending on the strike price it can be as little as 10% of the strike price.  **Ex. C.** Instead of the 10%-20% equity requirement by the clearing firm, eOption increased it to 50% equity to mitigate risks for clients and the firm. **Ex. C** ¶ 21.  When Hu found out about this new increased requirement, and his order was rejected because it did not satisfy the 50% equity requirement, Hu was visibly upset and expressed his dissatisfaction in an email. **Ex. C** ¶ 21. He wanted the margin requirement to remain at the lower percentage, but eOption stayed firm at this 50%. **Ex. C** ¶ 21. Thus, the effect of eOption increasing the requirements is that Hu had significantly less leverage in his account. Ironically, if the margin requirement had remained low as Hu desired, his actual losses would have been substantially greater -- as high as $3 million.

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

**b.    On a phone call in September 2017, Hu was warned of the risks of his position.**

On a phone call on September 8, 2017, a registered representative at eOption, Annie Calpe, told Hu that he should be aware that he is concentrated in the SVXY option position and that eOption may be rejecting future orders. **Ex. C ¶ 22.** Hu told eOption that he had another options account at a different broker-dealer, OptionsXpress, and had been comparing quotes between the two firms. **Ex. C ¶ 22.** Because this was an unsolicited, self-directed online trading account, he was charged just $3/trade, Hu made all his own trading decisions in his account, entirely on his own accord. **Ex. C ¶ 22.** There was no broker or advisor associated with the account, nor was any advice given at any time. **Ex. C ¶ 22.** Hu wanted a speculative, high risk trading account at eOption where he entered the orders himself and created his own investment strategy, and he had the necessary income, net worth, profession, and risk objectives to do so, as well as the necessary signed agreements, including an executed margin agreement. **Ex. C ¶ 22.**

**c.    Hu's orders were rejected when they exceeded the margin requirement, and he fought the rejection.**

To further explain the email where Hu expressed dissatisfaction with the increased requirement, on September 29, 2017 eOption rejected an option order placed by Hu on SVXY, and the registered representative stated, "Please be aware that an order was rejected on SVXY because it exceeds the uncovered put contract limit for your account ending in 55. We currently hold a higher requirement for this security." *See* September 29, 2017, email attached as **Exhibit J**.

Hu was upset at the increased margin requirement at SVXY, and tried to fight the order rejection. On October 1, 2017, he stated in an email:

This is so shocking and unreasonable.

Before I opened the account with eOption, I specifically asked about the margin requirement for this and was told nothing special about it.

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

Now as one of your experienced customers, I feel so miserable to be treated like this. I had mistakenly thought small brokerage firms like you would respect and treat their experienced customers better than the large ones.

The account summary showed my buying power for option to be 377,601.53, there is absolutely no reason to reject an ordinary put sell order.

When a customer was approved for margin, it means he has the financial capability to withstand loss hence no reason for the brokerage firm to tell them what could or could not do. In case of a severe market down-turn, every put seller would experience a paper loss and may need to respond to a margin call. Until then, however, there is no reason whatsoever to restrict their trading (other than the arrogance of saying you know more than your customers).

Even if you plan to change margin requirement for some underline, it should be based on the sound statistics, not on the attitude of "I know more than you do and you have to do what I say". For example, how in the world could you justify an exchange-traded fund (or note) could be more risky than individual stock (not to mention biotech stocks)?

It is absurd to reject customer orders when your current margin calculation showed no excess of margin use. Moreover, you have not told us what the new formula for margin calculation (and the basis for that)."

**Ex. J** (emphasis added).

On October 2, 2017, eOption responded to Hu with the following email where eOption explained to Hu that the firm is holding higher requirements for SVXY "due to market conditions and volatility." It also tells Hu that he is holding a "concentration of SVXY uncovered put positions." The email states in pertinent part that

margin maintenance requirements may change without prior notice . . .[Regal] retain[s] absolute discretion to determine whether, when and in what amounts we will require additional collateral. In some situations, [Regal] may find it necessary to require a higher level of equity in your account. For example, we may require additional collateral if an account contains:

•Only one security or a large concentration of one or more securities; or

•Low-priced, thinly traded or volatile securities; or if

•Some of your collateral is or becomes restricted or non-negotiable or non-marginable. We also may consider market conditions and your financial resources.

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

[Regal] [is] holding higher requirements for SVXY due to market conditions and volatility. Also, your account is holding a concentration of SVXY uncovered put positions. . . .

**Ex. J** (emphasis added).

Although the margin requirement was now higher in the account due to market conditions and the volatility of SVXY and Hu was made fully aware of this fact, and he was also warned that his account was concentrated in SVXY, he was not deterred. **Ex. C** ¶ 9. He continued to sell uncovered puts on this position, on his own accord in his unsolicited and self-directed trading account, in accordance with his high-risk investment objectives and desire for speculation. **Ex. C** ¶ 9.

  6. **Hu had a history of trading an even larger concentrated position in SVXY options at a previous broker dealer.**

It is important to note that Hu had been trading an even larger position in SVXY options at a prior brokerage firm, before he opened at account at eOption. **Ex. C** ¶ 23.  In fact, Hu transferred over a short position in SVXY from another brokerage firm, OptionsHouse, where he was short a total of 200 SVXY puts at various strike prices and expiration dates. *See* Options Transfer Form to eOption, dated August 29, 2017, and the accompanying statement from OptionsHouse, attached as **Exhibit K**. This statement from OptionsHouse shows that Hu had a history of this concentrated trading position in selling uncovered puts on SVXY. *See* **Ex. K**.  It is evident from his trading strategy at eOption that he made the decision on his own accord in his self-directed account to continue this exact same trading strategy in SVXY options.

Hu continued this same short strategy in SVXY puts at eOption in his self-directed account. **Ex. C** ¶ 13.  Hu was short 102 SVXY put contracts at eOption in early February 2018 (while he had nearly double this short position, 200 contracts, at OptionsHouse). **Ex. C** ¶ 13.  This further disproves the repeated theme of being a small-time amateur investor presented throughout Hu's motion.

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

### C.    HU'S OTHER UNSUCCESSFUL FINRA ARBITRATION.

Important to this Court's consideration, but wholly absent from Hu's motion, is Hu's other, contemporaneous, unsuccessful FINRA arbitration, in which another brokerage was awarded nearly $375,000 against Hu because of the exact same trading strategy at the heart of this case—selling uncovered puts on SVXY.  *See* **Ex. D**; **Ex. E**.  Indeed, on April 20, 2018, Charles Schwab & Co. (Charles Schwab) initiated a FINRA arbitration against Hu to recover a debt of nearly $375,000 that Hu accrued when selling uncovered puts on SVXY. **Ex. D**.  Charles Schwab would later prevail and reduce their arbitration award to judgment. **Ex. E**.

### D.    THE UNDERLYING FINRA ARBITRATION.

Less than a week after being sued by Charles Schwab, Hu recycled his answer in the Charles Schwab arbitration and used it to file an arbitration complaint with FINRA against Regal, alleging, as he does here, that his own financial missteps were actually Regal's fault. **Ex. C ¶ 24**.  Regal responded and asserted a counterclaim for breach of contract against Hu for the shortfall in his account, seeking the $265,338.43, plus attorney fees, that Hu owed Regal. **Ex. C ¶ 24**.

During the arbitration, Hu was, pursuant to FINRA Code of Arbitration Procedure for Customers § 12400(a), given an opportunity to strike and rank the proposed arbitrators for selection, which Hu admits he did.[11] ECF No. 1 at 9.

Further, early in the arbitration process, Regal subpoenaed Hu's complete personal and business tax returns. **Ex. C ¶¶ 26–28**.  Hu fought this disclosure but was, eventually, ordered by the FINRA panel to provide his complete personal and business tax returns. **Ex. C ¶¶ 26–32**.  Hu repeatedly refused to comply.[12] **Ex. C ¶¶ 26–32**.  Instead, Hu provided

---

[11] Hu picked a panel for his FINRA arbitration with Charles Schwab prior to picking a panel in the Regal case, and the process of ranking and striking was identical to the Charles Schwab case. **Ex. C ¶ 25**.

[12] Hu's repeated refusal to comply with the panel's discovery orders were the basis of the $23,000 monetary sanction imposed on Hu. *See* **Ex. C ¶ 44**; *see also* the June 4, 2019 FINRA Office of

only first two pages of his personal tax returns for 2015-2017, which were unsigned and appeared to be edited. **Ex. C ¶ 28.** There were no required schedules attached, and Hu still refused to provide his corporate tax return for his business. **Ex. C ¶ 28.**

When the FINRA panel then ordered Hu to send a form to the IRS requesting complete copies of his personal and corporate tax returns for 2015-2018, and provide a copy to Regal and the panel so all parties could see that it was done, Hu alleged that he sent it to the IRS, but he "forgot" to make a copy for Regal and the panel.[13] **Ex. C ¶ 41.**

Then, in direct violation of various FINRA arbitration rules and the FINRA panel's orders, Hu refused to disclose documents and information concerning other firms where he had brokerage accounts, or provide statements as required in the required FINRA discovery. **Ex. C ¶ 28–30.** As a result, Regal requested that the FINRA arbitration chair execute orders of production directed at these non-party entities. **Ex. C ¶ 30.** As a result of those orders of production, Regal discovered that Hu was trading the same exact investment product at issue in this case at several other brokerage firms, including Charles Schwab. **Ex. C ¶ 30.** More critically, through this discovery, Regal discovered Hu's other, ongoing FINRA arbitration against Charles Schwab, based on that same exact product, during the same exact time-frame, and alleging the same exact allegations against Schwab that Hu asserts now. **Ex. C ¶ 30.**

### 1.   Hu's manufactured bias claim

Upon Regal's discovery of the Charles Schwab arbitration, Hu went into a tailspin. Ex. C ¶¶ 31–52. Hu first went to the head of FINRA arbitration and asked, without any basis, that the entire FINRA panel be thrown out due to "bias" and that a new arbitration date be awarded. *See* July 5, 2019 letter, attached as **Exhibit M**.

---

Dispute Resolution Order imposing $23,000 in monetary sanctions against Hu, attached as **Exhibit L**.

[13]  To this day, Hu has still not provided any update on the tax forms or any responses or tax returns from 2015-2017 from the IRS, which were required for Hu to provide to Regal months ago under the FINRA discovery guidelines. **Ex. C.**

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

About two weeks later, FINRA notified all parties that the FINRA Director of the Office of Dispute Resolution, Rick Berry, denied Hu's application. *See* July 17, 2019, letter, attached as **Exhibit N**. Berry informed the parties that the panel will not be removed, nor will the FINRA arbitration (scheduled to start in 4 days) be postponed. *See* **Ex. N**. The same day, Hu sent individual letters to each panelist, asking them to recuse themselves for "extreme bias." *See* July 17, 2019, letters, attached as **Exhibits O, P, Q**.   After Regal opposed these attempts to disqualify the panelists, each panelist responded separately, indicating that the arbitrators would not recuse themselves and would continue with the arbitration as planned on July 23, 2019.   *See* July 19, 2019 letter from Andrew Mintzer, attached as **Exhibit R**; July 19, 2019 email from David Moran, attached as **Exhibit S**; July 19, 2019 letter from Erik Siering, attached as **Exhibit T**.

On July 23 and 24, 2019, the arbitration took place in Las Vegas. **Ex. C** ¶ 53.   Hu presented his case for nearly five hours before the panel on the first day, and had ample time to present his case, bring any witnesses and experts (Hu chose not to), and cross examine Regal's witnesses. **Ex. C** ¶ 53.   The panel took care to ensure that Hu had time to present all of his facts and arguments. **Ex. C** ¶ 53. At the end of the hearing, Regal's counsel, asked Hu on the record if he has had a "full and fair hearing." **Ex. C** ¶ 53.   Hu responded "yes." **Ex. C** ¶ 53.

### 2.   The Award.

Eventually, after the lengthy and contentious discovery period and arbitration, on August 8, 2019, the FINRA panel unanimously awarded Regal the full amount it was seeking in its counterclaim, including interest, attorneys' fees, and a monetary sanction against Hu. *See* **Ex. B**; **Ex. C** ¶ 54.

## III.   LEGAL ARGUMENT

The Court's review of an arbitration award is highly deferential. *PowerAgent Inc. v. Elec. Data Sys. Corp.*, 358 F.3d 1187, 1193 (9th Cir. 2004).   The Federal Arbitration Act sets forth the limited circumstances under which a court may vacate an arbitration award:

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH COFFING

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1 (1) where the award was procured by corruption, fraud, or undue means;

2 (2) where there was evident partiality or corruption in the arbitrators, or either of them;

3

4 (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

5

6 (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

7

8 9 U.S.C. § 10(a); *see also Wall Street Assocs., L.P. v. Becker Paribas Inc.*, 27 F.3d

9 845, 848 (2d Cir. 1994) (noting "the FAA's strong presumption in favor of enforcing

10 arbitration awards."). The party moving to vacate the award bears the burden of proof.

11 9 U.S.C. § 10(a); *see also D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006)

12 Here, although Hu ostensibly asserts each of the four circumstances occurred, *see*

13 ECF No. 1 at 31–35, Hu cannot demonstrate any grounds for this Court to vacate the

14 arbitration award and, as a result, this Court should deny his motion.

15 **A. HU CANNOT DEMONSTRATE THE AWARD WAS PROCURED BY UNDUE MEANS.**

16

17 **1. <u>The arbitrators were not required to state the reason for their decision.</u>**

18 Hu seems to believe the arbitrators did not give sufficient rationale behind their

19 arbitration award. ECF No. 1 at 34. However, arbitrators are not required to state the

20 reasons for their decisions. *United Steelworkers of America v. Enterprise Wheel & Car*

21 *Corp.*, 363 U.S. 593, 598 (1960); *Kaiser Cement Corp. v. Fischbach and Moore, Inc.*, 793

22 F.2d 1100, 1102 n.6 (9th Cir.1986). That is because the Court presumes the arbitrators took

23 a permissible route to the award where one exists. *A.G. Edwards & Sons, Inc. v.*

24 *McCollough*, 967 F.2d 1401, 1403 (9th Cir. 1992). As a result, the Court should confirm an

25 award if "a ground for the arbitrator's decision can be inferred from the facts of the case."

26 *PartnerWeekly, LLC v. Viable Mktg. Corp.*, 2:09-CV-02120-PMP, 2012 WL 1185673, at *3

27 (D. Nev. Apr. 9, 2012) (citing *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 110

(2d Cir. 2006).   "Only a barely colorable justification for the outcome reached by the arbitrators is necessary to confirm the award." *Id.*

Here, the grounds for the arbitrator's decision can easily be inferred from the facts of the case: Hu, as an experienced trader, took a position that could move against him if the price of SVXY went down. As a result of the volatile market, Hu's position moved against him. Hu did not have sufficient capital to cover his position and, even after Regal's actions to stem his losses, Hu owed Regal $265,338.43. Hu then violated the margin agreement by failing to repay that amount. Thus, the arbitrator's $265,338.43 principal award is easily inferred from the facts before the arbitrators. Further, the arbitrators found that Hu intentionally violated their discovery orders and, as a result, assessed against him a monetary sanction, which is within the purview of FINRA arbitrators.[14]   Further, the FINRA panel assessed attorney fees against Hu, as provided by his new account paperwork.   Thus, because the entirety of the FINRA arbitration award can be inferred from the record, this Court should reject Hu's meek argument regarding the sufficiency of the rationale behind the arbitration award and, in doing so, deny Hu's motion.

### 2.   Hu does not demonstrate undue influence.

Here, beyond baldly asserting that "the award was procured by 'undue means,'" ECF No. 1 at 32, Hu fails to present any argument or evidence that Regal committed fraud upon the panel that was (1) not discoverable upon the exercise of due diligence prior to the arbitration, (2) materially related to an issue in the arbitration, and (3) established by clear and convincing evidence. *A.G. Edwards & Sons, Inc.*, 967 F.2d at 1403. Thus, this Court can safely disregard Hu's bare-bones argument regarding undue influence. As a result, the

---

[14]  FINRA's Code of Arbitration Procedure for Customer Disputes § 12212(a) provides that "[t]he panel may sanction a party for failure to comply with any provision in the [Code of Arbitration Procedure], or any order of the panel or single arbitrator authorized to act on behalf of the panel" and that, "[u]nless prohibited by applicable law, sanctions may include, but are not limited to . . . [a]ssessing monetary penalties payable to one or more parties; . . . [a]ssessing postponement and/or forum fees; and [a]ssessing attorneys' fees, costs and expenses."

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1  Court should deny Hu's motion and should, instead, reduce the FINRA arbitration award to

2  judgment.

3  **B.    HU DOES NOT DEMONSTRATE EVIDENT PARTIALITY.**

4  Hu then presents a litany of baseless arguments regarding the FINRA panel's

5  purported partiality. ECF No. 1 at 8–21. However, none of the arguments demonstrate

6  evident partiality because Hu simply presents frequently-rejected arguments that arbitration

7  is generally unfair; that arbitrators appointed by FINRA are institutionally biased in favor of

8  the securities industry; or that the panel's evidentiary decisions somehow demonstrate bias.

9  Because Hu presents no evidence of evident partiality, this Court should deny his motion.

10  **1.    Hu does not demonstrate evident partiality prior to the hearing.**

11  On this point, Hu claims that the Award should be vacated because either arbitration

12  is generally unfair or because arbitrators appointed by FINRA are institutionally biased in

13  favor of the securities industry.[15]  ECF No. 1 at 3–14. Hu's claim is not based on any

14  specific facts relating to this case, nor is it based on any admissible or judicially noticeable

15  evidence; rather, Hu relies entirely on conjecture and unrelated news articles. ECF No. 1 at

16  3–8. In the absence of any specific facts that point to any arbitrator's improper motive, Hu's

17  motion to vacate the Award should be denied.

18  Indeed, generalized attacks on arbitration "res[t] on suspicion of arbitration as a

19  method of weakening the protections afforded in the substantive law to would-be

20  complainants," and as such, they are "far out of step with [the Supreme Court's] current

21  strong endorsement of the federal statutes favoring this method of resolving disputes."

22  *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 480 (1989); *see also Gilmer

23  v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 30 (1991) ("declin[ing] to indulge the

24

---

25  [15] Hu also argues that the panelists demonstrated evident partiality by previously ruling in favor of Regal or in failing to recuse themselves after being presented with these same arguments. This, too,
26  fails. The mere fact that the arbitrators find in favor of the opposing party does not establish partiality. *See Polin v. Kellwood Co.*, 103 F. Supp. 2d 238, 259–60, 2000 WL 877011 (S.D.N.Y.
27  2000). Thus, the Court can also reject this argument.

1  presumption that the parties and arbitral body conducting a proceeding will be unable or

2  unwilling to retain competent, conscientious and impartial arbitrators.").

3  Additionally, courts have repeatedly rejected the very same argument that Hu makes

4  here—that arbitrators appointed by securities self-regulatory organizations are institutionally

5  biased in favor of the securities industry. *See Ruei-Chan v. Merrill Lynch Pierce, Fenner &*

6  *Smith, Inc. (In re N.Y. Stock Exch.)*, 04 CIV. 488 (RWS), 2004 WL 2072460, at *5

7  (S.D.N.Y. Sept. 8, 2004) (denying motion to vacate and finding that evidence was

8  inadequate to raise a serious question as to the existence of an institutional bias); *Alberti v.*

9  *Morgan Stanley*, 97 CIV. 9385 (RO), 1998 WL 438667, at *1 (S.D.N.Y. July 31, 1998),

10  *aff'd sub nom. Alberti v. Dean Witter Reynolds Inc.*, 205 F.3d 1321, 2000 WL 19090 (2d

11  Cir. 2000) (rejecting allegations that arbitrators appointed by the New York Stock Exchange

12  were institutionally biased because they treated Morgan Stanley deferentially due to the size,

13  volume and stature of its dealings on the New York Stock Exchange and stating that

14  "allegations of bias must be specific; the appearance of bias is insufficient and mere

15  speculation is not enough.").

16  This Court should follow *Gilmer* and *Rodriguez de Quijas and* should be guided by

17  the decisions in *Ruei-Chan* and *Alberti* in determining that Hu has failed to establish any

18  evidence establishing that arbitrators were actually biased against him, and his motion to

19  vacate the Award on the basis of the alleged "institutional bias" should be denied.

20  **2.      Hu does not demonstrate evident partiality during the hearing**

21  Hu then attempts to assert that evident partiality occurred during the hearing because

22  he was sanctioned for failing to comply with the panel's discovery orders, ECF No. 1 at 11-

23  14, and because the panel "refuse[d] to admit critical evidences against Regal" while

24  "admit[ting] unlawful evidences for Regal by manifestly disregarding laws." ECF No. 1 at

25  17-21. While it is unclear whether Hu makes these challenges under 9 U.S.C. § 10(a)(2)

26  (evident partiality) or under 9 U.S.C. § 10(a)(3) (arbitrators "guilty of misconduct in

27  refusing . . . to hear evidence pertinent and material to the controversy"), the result is the

MAC:15872-001 Opposition to #1 Jay Hu_s Motion to Vacate Arbitration Award 12/30/2019 3:10 PM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

same: Hu fails to demonstrate any impropriety in the arbitration concerning the panel's evidentiary decisions and, thus, this Court should deny his motion.

### a. Hu has failed to establish that the arbitrators' evidentiary rulings were the result of improper motive.

Hu argues that the FINRA panel "refuse[d] to admit critical evidences against Regal," ECF No. 1 at 17–19, but "admit[ed] unlawful evidences for Regal by manifestly disregarding laws." ECF No. 1 at 20–21.  However, in reviewing the Award, the Court "cannot revisit [the panels'] evidentiary rulings." *Aramark Facility Services v. Serv. Employees Int'l Union, Local 1877, AFL CIO*, 530 F.3d 817, 828 & n.6 (9th Cir. 2008); *see also United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 40 (1987) ("[W]hen the subject matter of a dispute is arbitrable, 'procedural' questions which grow out of the dispute and bear on its final disposition are to be left to the arbitrator."). On this ground alone the Court can safely deny Hu's motion.

Even if the Court were to review the evidentiary rulings, however, the result would be the same: because rulings—even "repeated rulings"—against one party to the arbitration "will not establish bias absent some evidence of improper motivation," Hu cannot establish any improper motivations behind the arbitrators' evidentiary rulings, and this Court should deny his motion. *Sheet Metal Workers Int'l Ass'n Local Union No. 420 v. Kinney Air Conditioning Co.*, 756 F.2d 742, 746 (9th Cir. 1985); *see also Bell Aerospace Co. Div. of Textron, Inc. v. Local 516, Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. (UAW)*, 500 F.2d 921, 923 (2d Cir. 1974) (claim that arbitrator consistently relied on evidence and reached conclusions favorable to one side did not establish "evident partiality"); *Eagle Jet Aviation Inc. v. Woods*, 403 P.3d 684, 2017 WL 2813985, at *4 (Nev. 2017) (unpublished) (denying motion to vacate arbitration based on claim that arbitrators punished plaintiff for alleged "discovery abuse" while allowing the defendant's allegedly "much greater discovery abuse" to go unpunished).

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

Further, despite Hu's disagreement with the panel's decision to admit evidence against him, it is well established that arbitrators are not bound by the rules of evidence. *Gilmer*, 500 U.S. at 31 (noting that an important counterweight to the reduced discovery in NYSE arbitration is that arbitrators are not bound by the rules of evidence); *see also Bell Aerospace Co. Div. of Textron, Inc.*, 500 F.2d at 923 (arbitrators may admit and rely on evidence that would be inadmissible under the formal rules of evidence).   Courts also give great deference to the arbitrators' decision to control the order, procedure and presentation of evidence at the hearing, because when parties have agreed upon a particular method of dispute resolution, it should generally be presumed fair. *Kinney Air Conditioning Co.*, 756 F.2d at 746.

These principles apply here.  Hu agreed that the arbitration would be conducted in accordance with, among other things, the FINRA Code of Arbitration Procedure. **Ex. F** § 42. Pursuant to FINRA Code of Arbitration Procedure § 12604, the arbitrators are authorized to "decide what evidence to admit", and they are "not required to follow state or local rules of evidence."   Hu therefore agreed that the arbitrators had the authority to consider evidence that might be inadmissible in a court of law, and that process is presumed fair.[16]  Hu has failed to set forth any specific facts to overcome the presumption of fairness or to establish that the arbitrators' decision to admit the audio recording into evidence was the result of their improper motive against him. Thus, the Court should deny Hu's motion.

---

[16] Thus, the arbitrators' decision to admit into evidence the audio recording of the telephone call between Charles Schwab—discussed in Hu's motion as "Company S"—over Hu's objection was an authorized exercise of the arbitrators' authority under FINRA Code of Arbitration Procedure § 12604(a).  Further, because the panels were not required to follow state or local rules of evidence, Hu's objection to the two-party-consent recordation requirements of Nevada are irrelevant. Thus, this Court can disregard Hu's argument.

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

**C.    HU FAILED TO SHOW THE ARBITRATORS EXCEEDED THEIR POWERS**

Finally, Hu asserts that the "irrational" award against him was "completely unjustified." ECF No. 1 at 21–31. Hu is incorrect and, thus, this Court should deny his motion.

The Ninth Circuit has clarified that arbitrators "exceed their powers" only when the award is (1) "completely irrational" or (2) exhibits a "manifest disregard of the law." *Kyocera Corp. v. Prudential-Bache Trade Services, Inc.*, 341 F.3d 987, 997 (9th Cir. 2003). With regard to demonstrating a manifest disregard of the law, "the moving party must show that the arbitrator 'underst[oo]d and correctly state[d] the law, but proceed[ed] to disregard the same.'" *Collins v. D.R. Horton, Inc.*, 505 F.3d 874, 879 (9th Cir. 2007) (quoting *San Maritime Compania De Navegacion, S.A. v. Saguenay Terminals Ltd.*, 293 F.2d 796, 801 (9th Cir. 1961)). "[T]here must be some evidence in the record, other than the result, that the arbitrators were aware of the law and intentionally disregarded it." *Bosack v. Soward*, 586 F.3d 1096, 1104 (9th Cir. 2009) (quoting *Lincoln Nat'l Life Ins. Co. v. Payne*, 374 F.3d 672, 675 (8th Cir. 2004)).

### 1.    Hu does not demonstrate the Award is completely irrational.

"An award is completely irrational only where the arbitration decision fails to draw its essence from the agreement [requiring arbitration]." *Lagstein v. Certain Underwriters at Lloyd's, London*, 607 F.3d 634, 642 (9th Cir. 2010) (quoting *Comedy Club, Inc. v. Improv W. Associates*, 553 F.3d 1277, 1288 (9th Cir. 2009)). "The question is whether the award is irrational with respect to the contract, not whether the panel's findings of fact are correct. Whether or not the panels' findings are supported by the evidence in the record is beyond the scope of [this Court]." *Id.* at 641.

Here, Hu never challenge the panel's authority under the [contractual agreement] or that the panel reached their conclusions in anything resembling an irrational manner. [The contractual agreement] between Regal and Hu clearly mandates arbitration in the event of a

MARQUIS AURBACH COFFING

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

dispute. **Ex. F** § 42. Hu does not assert anything to the contrary, nor could he; Hu only disagrees with the findings and the outcome. This is the exact type of review not permitted by the Court. Thus, because the Award was not completely irrational, this Court should disregard Hu's argument and should deny his motion.

### 2. Hu does not demonstrate the panel manifestly disregarded the law.

Manifest disregard of the law means "something more than just an error in the law or a failure on the part of the arbitrators to understand or apply the law. To vacate an arbitration award on this ground, it must be clear form the record that the arbitrators recognized the applicable law and then ignored it." *Id.* at 641 (internal quotations and citations omitted). "There must be some evidence in the record, other than the result, that the arbitrators were aware of the law and intentionally disregarded it." *Bosack v. Soward*, 586 F.3d 1096, 1104–05 (9th Cir. 2009).

Here, Hu points to no evidence that the panel was "aware of the law and intentionally disregarded it." Rather, Hu points only to the result of the arbitration to demonstrate that the FINRA panel purportedly disregarded the law, *see generally* ECF No. 1 at 21–36, which does not justify vacatur under 9 U.S.C. § 10(a)(4). And because Hu has the burden of demonstrating any purported error warranting vacatur, *see D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006), Hu's failure to identify any error here requires this Court deny his motion.

### D. THIS COURT SHOULD AWARD REGAL ITS REASONABLE ATTORNEY FEES AND COSTS INCURRED IN OPPOSING HU'S MOTION.

Nevada law further vests this Court with the discretion to award attorneys' fees and costs for a prevailing party in an action to vacate, confirm, or modify an arbitration award. *See* Nev. Rev. Stat. § 38.243(2) ("A court may allow reasonable costs of the motion [to confirm an arbitration award"); Nev. Rev. Stat. § 38.243(3) ("On application of a prevailing party to a contested judicial proceeding [to confirm an arbitration award], the court may add

MAC:15872-001 Opposition to #1 Jay Hu_s Motion to Vacate Arbitration Award 12/30/2019 3:10 PM

**MARQUIS AURBACH COFFING**
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

reasonable attorney's fees and other reasonable expenses of litigation incurred in a judicial proceeding after the award is made to a judgment confirming, vacating without directing a rehearing, modifying or correcting an award."); *see also Sanchez v. Elizondo*, 3:15-cv-00474-RCJ-CBC, 2018 WL 5833052, at *1 (D. Nev. Nov. 7, 2018) (awarding fees under Nev. Rev. Stat. § 38.243(3) to the prevailing party successfully opposing motion to vacate FINRA arbitration award).

Upon entry of the order denying Hu's motion to vacate the Award and reducing the Award to judgment, and the entry of a judgment consistent therewith, this Court should award Regal its reasonable fees and costs.  Regal will timely submit a verified memorandum of fees and costs upon notice by the Court that costs and fees are appropriate.

## IV.    **CONCLUSION**

Based on the foregoing, respondent Regal Securities, Inc., respectfully request the Court (1) deny Hu's motion, (2) reduce the FINRA arbitration to judgment, and (3) award Regal its reasonable attorney fees and costs incurred opposing Hu's motion pursuant to Nev. Rev. Stat. § 38.243(3).

Dated this 20th day of December, 2019.

MARQUIS AURBACH COFFING

By: _____
Terry A. Coffing, Esq.
Nevada Bar No. 4949
10001 Park Run Drive
Las Vegas, Nevada 89145
Attorney for Respondent Regal Securities,
Inc.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing **RESPONDENT REGAL SECURITIES, INC.'S RESPONSE TO MOTION TO VACATE ARBITRATION AWARD** with the Clerk of the Court for the United States District Court by using the court's CM/ECF system on the ____ day of December, 2019.

⊠      I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

⊠      I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Jay Hu
62 Sandy Bunker
Las Vegas, Nevada 89148
Petitioner, *Pro Se*

_____
An employee of Marquis Aurbach Coffing

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:15872-001 Opposition to #1 Jay Hu_s Motion to Vacate Arbitration Award 12/30/2019 3:10 PM