UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| JAY HU,<br><br>Petitioner,<br><br>v.<br><br>REGAL SECURITIES, INC.,<br><br>Respondent. | Case No. 2:19-CV-1930-KJD-NJK<br><br>ORDER |

Presently before the Court is Petitioner's Motion to Vacate Arbitration Award (#1). Respondent filed a response in opposition (#11) to which Petitioner replied (#14). Also before the Court is Respondent's Motion to Confirm Arbitration Award (#9-2/11).

I. Background

In August 2017, Hu, a long-time statistician[1] and owner of a statistical analysis company, opened an individual trading account at eOption, an online discount trading division of Regal. As such, the account was self-directed by Hu, and all trades were unsolicited—which means that Hu made all of his investment decisions entirely of his own accord with no recommendations from eOption. There was no broker or investment advisor associated with his account, and Hu entered all orders himself through eOption's online web-based platform.

In Hu's new account paperwork, he marked "10+ years" for Stocks, and "10+ years" for Options. Additionally, Hu indicated that his annual income is "$100,000 -$249,999," that his net worth (exclusive of his residence) is $1,000,000 - $3,000,000 and that his liquid net worth is $500,000 - $999,999. Hu also indicated that "the investments in this account will be 1/3 of [his]

---

[1] Hu complains that he provided three years of tax returns which show dwindling income to Respondent when he opened his account. His dwindling income is blamed on outsourcing of his type of job. He argues that Respondent should have treated him with kid gloves because of this.

financial portfolio," which indicated to Regal that his investments did not represent his "life savings," as he now claims in his motion. Hu also indicated "[m]arket speculation" was his investment objective and that his risk tolerance was "[h]igh," both of which are the highest and most aggressive categories on the application.

Hu's option account application also supports his years of investment experience and desire for speculation. In doing so, Hu again requested the highest level of options trading available at eOption, and further indicated his high income, net worth, years of investment experience, and desire for speculation. Indeed, Hu again marked the most speculative and aggressive trading boxes. Under Investment Objective, Hu marked the most aggressive objective, "[s]peculation," and when indicating what his "[p]rior [o]ption [a]ctivity [h]as [b]een," he marked "[u]ncovered (sales)," again, the most speculative category, and for "[p]rior [o]ption [t]rading [f]requency," Hu indicated he was "[a]ctive," the highest category. Under "[p]rior [o]ption [t]rading [o]ccurred in [w]hat [a]ccount [t]ype," Hu indicated he had traded options using "[b]oth" cash and margin. Out of eight possible boxes he could mark for the category "I plan to use this account for the following (Check all that apply)," Hu marked only one box, again for the most aggressive category, "[m]arket speculation." Additionally, under "[c]ustomer [f]inancial [i]nformation," Hu indicated he had "10+ years" of investment experience with stocks and "10+ years" with options. Finally, not only did Hu mark the most speculative category on every entry on his option application, he also applied for "Level 4" options trading permission, which is the highest, most speculative level of option trading available at eOption.[2]

Hu also signed paperwork to open a margin account at eOption. The margin disclosure statement states the risks of purchasing securities on margin and provides, in relevant part:

> This statement is being furnished to you to provide some basic facts about purchasing securities on margin, and to alert you to the risks involved with trading securities in a margin account. <u>Before trading stocks in a margin account, you should carefully review the Margin Agreement provided by [Regal]</u> . . ..
>
> When you purchase securities, you may pay for the securities in full or you may borrow part of the purchase price from [Regal's clearing

---

[2] Hu also utilized this strategy at other brokerages, including Charles Schwab, that also resulted in Hu incurring massive debts to those brokerages.

> firm]. If you choose to borrow funds, a margin account will be opened. The securities purchased are collateral for the loan to you. <u>If the securities in your account decline in value, so does the value of the collateral supporting your loan, and, as a result, [Regal's clearing firm] or [Regal] can take action, such as issue a margin call and/or sell securities or other assets in any of your accounts held with [Regal's clearing firm], in order to maintain the required equity in the account It is important that you fully understand the risks involved in trading securities on margin.</u>

(emphasis added).

The margin disclosure statement explicitly provides the client with a list of potential risks, including:

> • You can lose more funds than you deposit in the margin account. A decline in the value of securities that are purchased on margin may require you to provide additional funds to [Regal's clearing firm] to avoid the forced sale of those securities or other securities or assets in your account(s).
>
> • [Regal] . . . can force the sale of securities or other assets in your account(s). If the equity in your account falls below the maintenance margin requirements or [Regal's clearing firm]'s higher "house" requirements . . . [Regal] can sell the securities or other assets in any of your accounts held at [Regal's clearing firm] to cover the margin deficiency. You also will be responsible for any shortfall in the account after such sale
>
> • Your securities or other assets may be sold without contacting you . . . if this is not the case . . . the firm can still take necessary steps to protect their financial interests, including immediately selling the securities without notice to the customer.
>
> •  You are not entitled to choose which securities or other assets in your accounts) are liquidated or sold to meet a margin call. Because the securities are collateral for the margin loan . . . [Regal] has the right to decide which security to sell in order to protect [Regal's clearing firm]'s interests.
>
> • "House" maintenance margin requirements may be increased at any time without advance written notice. These changes in [Regal's clearing firm]'s policy often take effect immediately and may result in the issuance of a maintenance margin call. Your failure to satisfy the call may cause [Regal's clearing firm] or [Regal] to liquidate or sell securities in your account(s).
>
> • You are not entitled to an extension of time on a margin call. While an extension of time to meet margin requirements may be available to customers under certain conditions, a customer does not have a right to the extension.

Thus, the margin disclosure statement put Hu on notice of the risks of trading on margin.

1    The margin disclosure statement warns that, as occurred here, "[y]ou can lose more funds than
2    you deposit in the margin account." Further, the margin disclosure statement clearly states that
3    Regal can force the sale of securities or other assets in Hu's accounts if the account falls below
4    the higher maintenance "house" requirements to cover any margin deficiency. The language also
5    states that Hu will be responsible for any shortfall in the account after such a forced sale.
6         Hu also received a special statement for uncovered option writers when he opened his
7    option trading account at eOption. The disclosure clearly states that "the risk of writing
8    uncovered put options is substantial," and that eOption may request "significant additional
9    margin payments" if "the value of the underlying instrument moves against an uncovered writer's
10   options position." Further, the disclosure warns that "[i]f an investor will not make" these
11   additional payments, then eOption has the right to liquidate the positions in his account.
12        Not only were the risks of selling naked puts on margin outlined in Regal's option
13   account application and margin agreement, but, on August 24, 2017, Hu also received a 188-
14   page options disclosure document entitled "Characteristics and Risks of Standardized Options"
15   when he opened his option trading account at eOption, which detailed many of the risks of
16   trading various option strategies. The options disclosure document has an entire section entitled
17   "Principal Risks of Option Holders" which has 30 pages describing risks and examples of
18   various option trading positions.
19        The options disclosure document also informs the option writer of his obligations when,
20   as would soon be the case with Hu, a trading market becomes unavailable or there is a sudden
21   development that causes a sharp downward spike in the value of the underlying stock: "If a
22   trading market in an option should become unavailable, or if the writers of the option are
23   otherwise unavailable to engage in closing transactions, the writers of that option would remain
24   obligated until expiration or assignment." Additionally, the options disclosure document
25   provides that "[a] sudden development may cause a sharp upward or downward spike in the
26   value of the interest underlying a capped option. Such a spike could cause the capped option to
27   be automatically exercised, and writers of the option to become obligated to pay the cash
28   settlement amount." In such an event, "[w]hen trading in an option is halted or suspended,

holders and writers of that option will be unable to close out their positions until trading resumes, and they may be faced with substantial losses if the value of the underlying interest moves adversely during; that time."

eOption has a standard process for reviewing and approving option trading requests. Each option application is carefully reviewed to determine if the client has the necessary qualifications, experience and resources to trade options, and at what level. Factors that are considered are age, income, employment, investment objectives, investment experience, and financial assets. After reviewing Hu's new account paperwork and option application, the firm determined that Hu had the adequate high income, high net worth of over a million dollars, over a decade of options trading experience, the highest risk tolerance, and the most speculative trading objective to engage in a "Level 4" trading strategy in his self-directed, unsolicited trading account at eOption.

As an experienced, high-net-worth trader, Hu engaged in a very speculative strategy of selling uncovered puts. This strategy involves selling put options for cash premiums with limited reserved cash on hand to purchase the underlying stock if it became necessary. Importantly, Hu's strategy also relies on a steady or rising stock price—as opposed to a declining stock price—that causes the option to expire worthless. This is considered a highly speculative strategy, and an unfavorable market move downward could cause the investor to have to post additional margin or liquidate their position at a substantial loss. Hu utilized this strategy, apparently successfully for a period of time, until the market went significantly against him in early February 2018.

Hu engaged in a high risk, speculative pattern of option trading that took advantage of a low volatility market environment that worked successfully for him from 2017 through early February 2018. He was most likely utilizing the same strategy at several other discount brokerage firms, including, among others, Charles Schwab.

Specifically, as to Hu's strategy, he was engaging in a "Level 4" speculative options strategy, which involved selling uncovered puts on the underlying security, SVXY, to collect premium, but which also obligates him to buy SVXY shares at the strike price he sold the options at (if the market price of SVXY falls below the strike price). SVXY is an exchange

traded fund (ETF) that seeks daily investment results, before fees and expenses, that correspond to one times the inverse (-lx) of the daily performance of the S&P 500 VIX Short-Term Futures Index. Hu's maximum gain was the premium earned when he initially sold the option, and his maximum loss would occur if SVXY shares fell to zero.

By selling uncovered puts on SVXY, Hu's goal was to have the options expire worthless while he kept the put sale proceeds and enjoyed a stream of income. For the five months his trading account was at eOption—from September 2017 through early February 2018—Hu earned $64,306.47 in option premiums by selling these uncovered puts. He also was doing this exact same strategy at his previous brokerage firm, OptionsHouse. Hu was profitable in the low volatility market that existed for quite some time by engaging in this strategy at various discount brokerage firms.

By selling uncovered puts on SVXY, Hu was predicting that the underlying security, SVXY, would either remain flat or go up. On January 31, 2018, SVXY closed at a price of $118.11. By February 2, the security closed at $105.60. On Monday, February 5, the overall market declined even more and SVXY closed at $71.82. During market hours on February 5, Hu continued to sell more uncovered puts on SVXY to collect even more premium. In the after-hours market on February 5, the market experienced a tremendous volatility spike that resulted in the underlying security, SVXY, substantially falling in value. When SVXY closed on February 5 at a price of $71.82, Hu was not in a margin call situation at the market close. A margin call would have been triggered in Hu's account when SVXY reached a price of approximately $47.05. However, in after-hours trading that day, due to extreme market volatility, the stock plunged to as low as $11.00, which placed Hu in a substantial margin call that required additional funds to be deposited. eOption's risk manager phoned Hu after the close on Monday, February 5 to inform him of the after-hours drop in price.

Hu was short a total of 102 uncovered puts on SVXY, and unfortunately, options do not trade in the after-hours market, and thus there was no opportunity for Hu to cover (i.e. buy back) his option positions on SVXY. When the price of SVXY fell below $47.05 in the after-hours market, Hu was in a margin call.

When the market opened on February 6, 2018, trading of SVXY was temporarily halted and opened hours after most stocks that day, at a price of $11.70 (which was down more than 80%, or $60.12 from the previous close of $71.82/share). eOption's Risk Management Department bought to cover 64 short puts on SVXY and covered a small position on VXX6 at a total cost of $457,605.96—which was the amount of cash that Hu had in his account. In accordance with the Margin Agreement, the firm's Risk Management Department used this balance to cover a portion of the amount he owed, but there was still a remaining amount due.

Also, 5 puts were assigned to Hu that evening on February 6 that were "deep in the money." A "deep in the money" option has an exercise, or strike price, significantly above (for a put option) the market price of the underlying security, SVXY. Thus, since Hu was assigned 5 "deep in the money" puts that day, he had to purchase 500 shares of SVXY at $70/share, for a total cost of $35,009.00. On the evening of Wednesday, February 7, Hu was assigned another 26 puts (where he had to buy 2600 shares of SVXY) at an expenditure of $228,027.00 (for the breakdown, he bought 1,300 shares at $85, 1200 shares at $90, and 100 shares at $95). This still left Hu's account with a long position of 3,100 shares of SVXY and short 7 SVXY naked puts.

On Thursday, February 15, eOption's Risk Management Department ultimately liquidated the remaining positions. At that time, eOption sold 3,100 shares of SVXY for approximately $39,990.00 and bought to cover the remaining 7 short puts for approximately $40,044.00. However, there was not enough to cover his entire balance, resulting in a shortfall in Hu's account of -$264,603.77. Hu did not and has not paid this amount.

After the close on February 5, when eOption's Risk Management Department saw the tremendous volatility spike in SVXY in the after-hours market, they communicated with Hu on a continual basis during this period. Hu asked that eOption not liquidate his positions since he thought the price decline was temporary. Hu said he needed a week or two to come up with funds to deposit to meet any shortfall, which eOption took as a clear message that he was not going to meet his margin call in a timely manner. eOption informed Hu that the firm was unable to wait that long and may need to act by the following morning. The Risk Management Department weighed the risks and made the evaluation that they could not wait to cover the

positions in the account. After extensive discussions with Hu about the state of his account on February 5th and 6th, the Risk Management Department determined that Hu was unable to deliver funds in a timely fashion to maintain the positions as he requested.

On February 6, 2018, in accordance with the Margin Agreement, the Risk Management Department used the cash in Hu's account to cover a portion of his debt; however, there were not enough funds to cover the entire amount he owed. Because Hu was now long SVXY stock, the Risk Management Department started selling the stock positions to generate more cash. Because there were not enough funds in his account to buy all the shares that Hu was obligated to pay for, eOption told Hu that his account was still underwater by approximately $265,338.43, and he had to promptly send these funds to eOption in accordance with the Margin Agreement he previously signed. However, Hu has refused to send in any additional funds to cover his debt.

Instead, Hu filed an arbitration complaint with FINRA against Regal alleging, as he does here, that his own financial missteps were actually Regal's fault. Regal responded and asserted a counterclaim for breach of contract against Hu for the shortfall in his account, seeking the $265,338.43, plus attorney fees, that Hu owed Regal.

During the arbitration, Hu was, pursuant to FINRA Code of Arbitration Procedure for Customers § 12400(a), given an opportunity to strike and rank the proposed arbitrators for selection, which Hu admits he did. Further, early in the arbitration process, Regal subpoenaed Hu's complete personal and business tax returns. Hu fought this disclosure but was, eventually, ordered by the FINRA panel to provide his complete personal and business tax returns. Hu repeatedly refused to comp1y. Instead, Hu provided only the first two pages of his personal tax returns for 2015-2017, which were unsigned and appeared to be edited. There were no required schedules attached, and Hu still refused to provide his corporate tax return for his business.

When the FINRA panel then ordered Hu to send a form to the IRS requesting complete copies of his personal and corporate tax returns for 2015-2018, and provide a copy to Regal and the panel so all parties could see that it was done, Hu alleged that he sent it to the IRS, but he "forgot" to make a copy for Regal and the panel.

Then, in direct violation of various FINRA arbitration rules and the FINRA panel's orders, Hu refused to disclose documents and information concerning other firms where he had brokerage accounts, or provide statements as required in the FINRA discovery rules. As a result, Regal requested that the FINRA arbitration chair execute orders of production directed at these non-party entities. As a result of those orders of production, Regal discovered that Hu was trading the same exact investment product at issue in this case at several other brokerage firms, including Charles Schwab. More critically, through this discovery, Regal discovered Hu's other, ongoing FINRA arbitration against Charles Schwab, based on that same exact product, during the same exact time-frame, and alleging the same exact allegations against Schwab that Hu asserts now.

Hu seemed to think that this discovery was improper. Hu first went to the head of FINRA arbitration and asked that the entire FINRA panel be thrown out due to "bias" and that a new arbitration date be awarded. About two weeks later, FINRA notified all parties that the FINRA Director of the Office of Dispute Resolution, Rick Berry, denied Hu's application. Berry informed the parties that the panel would not be removed, nor would the FINRA arbitration (scheduled to start in four days) be postponed. The same day, Hu sent individual letters to each panelist, asking them to recuse themselves for "extreme bias." After Regal opposed these attempts to disqualify the panelists, each panelist responded separately, indicating that the arbitrators would not recuse themselves and would continue with the arbitration as planned on July 23, 2019.

On July 23 and 24, 2019, the arbitration took place in Las Vegas. Hu presented his case for nearly five hours before the panel on the first day. He had ample time to present his case, bring any witnesses and experts (Hu chose not to), and cross examine Regal's witnesses. The panel took care to ensure that Hu had time to present all of his facts and arguments. At the end of the hearing, Regal's counsel, asked Hu on the record if he has had a "full and fair hearing." Hu responded "yes." On August 8, 2019, the FINRA panel unanimously awarded Regal the full amount it was seeking in its counterclaim, including interest, attorneys' fees, and a monetary sanction ("the Award") against Hu.

III. Standard for vacating an arbitration award

The Court's review of an arbitration award is highly deferential. PowerAgent Inc. v. Elec. Data Sys. Corp., 358 F.3d 1187, 1193 (9th Cir. 2004). The Federal Arbitration Act sets forth the limited circumstances under which a court may vacate an arbitration award:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a); *see also* Wall Street Assocs., L.P. v. Becker Paribas Inc., 27 F.3d 845, 848 (2d Cir. 1994) (noting "the FAA's strong presumption in favor of enforcing arbitration awards."). The party moving to vacate the award bears the burden of proof. 9 U.S.C. § 10(a); *see also* D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006).

IV. Analysis

The Court construes Petitioner's pro se pleadings liberally. It appears that Hu argues that the arbitration award should be vacated for each of the four circumstances noted above. However, an extensive review of the record demonstrates that Hu merely disagrees with rulings that went against him and has not met the limited circumstances in which the Court can vacate the arbitration award.

A. Failure to State a Reason for their Decision

Hu argues that the arbitrators did not give sufficient rationale behind their arbitration award. However, arbitrators are not required to state the reasons for their decisions. United Steelworkers of America v. Enterprise Wheel &Car Corp., 363 U.S. 593, 598 (1960); Kaiser Cement Corp. v. Fischbach and Moose, Inc., 793 F.2d 1100, 1102 n.6 (9th Cir.1986). The Court presumes the arbitrators took a permissible route to the award where one exists. A.G. Edwards &

1  Sons, Inc. v. McCollough, 967 F.2d 1401, 1403 (9th Cir. 1992). As a result, the Court should
2  confirm an award if "a ground for the arbitrator's decision can be inferred from the facts of the
3  case." Partner Weekly, LLC v. Viable Mktg. Corp., 2:09-CV-02120-PMP, 2012 WL 1185673, at
4  *3 (D. Nev. Apr. 9, 2012) (citing Gottdiener, 462 F.3d at 110).

Based on the Court's extensive and detailed review of the record in this case, it concludes that the arbitrator's decision can easily be inferred from the facts of this case: Hu, as an experienced trader, took a position that could move against him if the price of SVXY went down. As a result of the volatile market, Hu's position moved against him. Hu did not have sufficient capital to cover his position and, even after Regal's actions to stem his losses, Hu owed Regal $265,338.43. Hu then violated the margin agreement by failing to repay that amount. Thus, the arbitrator's $265,338.43 principal award is easily inferred from the facts before the arbitrators.

Further, the arbitrators found that Hu intentionally violated their discovery orders and, as a result, assessed against him a monetary sanction, which is within the purview of FINRA arbitrators. While the Court is always initially alerted to potential injustice when pro se parties are sanctioned, the record is clear that the arbitrator's gave Hu ample opportunity to comply with their well-explained discovery orders. Hu's disagreement with them does not give him the right to violate them. Nor does an adverse ruling demonstrate bias on the part of the arbitrators. The mere fact that the arbitrators find in favor of the opposing party does not establish partiality. See Polin v. Kellwood Co., 103 F. Supp. 2d 238, 259-60 (S.D.N.Y. 2000).

Further, the FINRA panel assessed attorney fees against Hu, as provided by his contract. Thus, because the entirety of the FINRA arbitration award can be inferred from the record, the Court rejects Hu's argument regarding the sufficiency of the rationale behind the arbitration award.

### B. Undue Influence

Hu asserts that the Award was procured by undue means appearing to assert that Regal defrauded the panel. In order to justify vacating an award because of fraud, the party seeking vacation must show that the fraud was (1) not discoverable upon the exercise of due diligence

prior to the arbitration, (2) materially related to an issue in the arbitration, and (3) established by clear and convincing evidence. See McCollough, 967 F.2d at 1404. Hu has failed to present any actual evidence of fraud. His parsing of their words and rulings to mean something other than what they said or stated is not evidence of fraud. The Court denies the motion to vacate based on these claims.

### C. Evident Partiality

Hu presents a litany of baseless arguments regarding the FINRA panel's purported partiality. ECF No. 1 at 8-21. However, none of the arguments demonstrate evident partiality because Hu simply presents frequently-rejected arguments that arbitration is generally unfair; that arbitrators appointed by FINRA are institutionally biased in favor of the securities industry; or that the panel's evidentiary decisions somehow demonstrate bias. Because Hu presents no evidence of evident partiality, the Court denies his motion based on evident partiality as follows.

#### 1. Evident Partiality Prior to the Hearing

On this point, Hu claims that the arbitration award should be vacated because either arbitration is generally unfair or because arbitrators appointed by FINRA are institutionally biased in favor of the securities industry. See ECF No. 1 at 3-14. Generalized attacks on arbitration "res[t] on suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants," and as such, they are "far out of step with [the Supreme Court's] current strong endorsement of the federal statutes favoring this method of resolving disputes." Rodriguez de Quijas v. Shearson/Am. Exp., Inc., 490 U.S. 477, 480 (1989); *see also* Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 30 (1991) ("declin[ing] to indulge the presumption that the parties and arbitral body conducting a proceeding will be unable or unwilling to retain competent, conscientious and impartial arbitrators.")

Hu's claim is not based on any specific facts relating to this case, nor is it based on any admissible or judicially noticeable evidence; rather, Hu relies entirely on conjecture and unrelated news articles. ECF No. 1 at 3-8. Courts have repeatedly rejected the very same argument that Hu makes here—that arbitrators appointed by securities self-regulatory

organizations are institutionally biased in favor of the securities industry. See <u>Ruei-Chan v. Merrill Lynch Pierce, Fenner & Smith, Inc. (In re N. Y. Stock Exch.)</u>, 2004 WL 2072460, at *5 (S.D.N.Y. Sept. 8, 2004) (denying motion to vacate and finding that evidence was inadequate to raise a serious question as to the existence of an institutional bias); <u>Alberti v. Morgan Stanley</u>, 97 CIV. 9385 (RO), 1998 WL 438667, at *1 (S.D.N.Y. July 31, 1998), *aff'd sub nom*. <u>Alberti v. Dean Witter Reynolds Inc.</u>, 205 F.3d 1321, 2000 WL 19090 (2d Cir. 2000) (rejecting allegations that arbitrators appointed by the New York Stock Exchange were institutionally biased because they treated Morgan Stanley deferentially due to the size, volume and stature of its dealings on the New York Stock Exchange and stating that "allegations of bias must be specific; the appearance of bias is insufficient and mere speculation is not enough."). In the absence of any specific facts that point to any arbitrator's improper motive, Hu's motion to vacate the award is denied.

### 2. Evident Partiality During the Hearing

Hu then attempts to assert that evident partiality occurred during the hearing because he was sanctioned for failing to comply with the panel's discovery orders, ECF No. 1 at 11-14, and because the panel "refuse[d] to admit critical evidences against Regal" while "admit[ting] unlawful evidences for Regal by manifestly disregarding laws." ECF No. 1 at 17-21. While it is unclear whether Hu makes these challenges under 9 U.S.C. § 10(a)(2) (evident partiality) or under 9 U.S.C. § 10(a)(3) (arbitrators "guilty of misconduct in refusing . . . to hear evidence pertinent and material to the controversy"), the result is the same. In reviewing the Award, the Court "cannot revisit [the panels'] evidentiary rulings." <u>Aramark Facility Services v. Serv. Employees Intl Union, Local 1877, AFL CIO</u>, 530 F.3d 817, 828 & n.6 (9th Cir. 2008); *see also* <u>United Paperworkers Intl Union, AFL-CIO v. Misco, Inc.</u>, 484 U.S. 29, 40 (1987) ("[W]hen the subject matter of a dispute is arbitrable, 'procedural' questions which grow out of the dispute and bear on its final disposition are to be left to the arbitrator."). Further, as already held by the Court adverse rulings alone, are not evidence of partiality.

Even if the Court were to review the evidentiary rulings, however, the Court would deny Hu's motion: because rulings—even "repeated rulings"—against one party to the arbitration

"will not establish bias absent some evidence of improper motivation," Hu has not established any improper motivations behind the arbitrators' evidentiary rulings. Sheet Metal Workers Intl. Ass'n Local Union No. 420 v. Kinney Air Conditioning Co., 756 F.2d 742, 746 (9th Cir. 1985); *see also* Bell Aerospace Co. Div. of Textron, Inc. v. Local 516, Intl. Union, United Auto., Aerospace & Agr. Implement Workers of Am. (UAW), 500 F.2d 921, 923 (2d Cir. 1974) (claim that arbitrator consistently relied on evidence and reached conclusions favorable to one side did not establish "evident partiality"); Eagle Jet Aviation Inc. v. Woods, 403 P.3d 684, 2017 WL 2813985, at *4 (Nev. 2017) (unpublished) (denying motion to vacate arbitration based on claim that arbitrators punished plaintiff for alleged "discovery abuse" while allowing the defendant's allegedly "much greater discovery abuse" to go unpunished).

Perhaps more importantly, it is well established that arbitrators are not bound by the rules of evidence. Gilmer, 500 U.S. at 31 (noting that an important counterweight to the reduced discovery in NYSE arbitration is that arbitrators are not bound by the rules of evidence); *see also* Bell Aerospace, 500 F.2d at 923 (arbitrators may admit and rely on evidence that would be inadmissible under the formal rules of evidence). Courts also give great deference to the arbitrators' decision to control the order, procedure and presentation of evidence at the hearing, because when parties have agreed upon a particular method of dispute resolution, it should generally be presumed fair. Kinney Air Conditioning Co., 756 F.2d at 746.

For example, Hu complains that audio recordings of phone calls between himself and Charles Schwab (described by Hu as "Company S" in his complaint and briefs) were improperly and illegally admitted. However, Hu had contractually agreed to arbitration and admitting the recordings was an authorized exercise of the arbitrators' authority under FINRA Code of Arbitration Procedure § 12604(a). Further, because the panel was not required to follow state or local rules of evidence, Hu's objection to the two-party-consent recordation requirements of Nevada are irrelevant. Therefore, the Court denies Hu's motion to vacate on these grounds.

### D. Arbitrators Exceeded their Powers

Further, Hu's assertion that the Award is irrational and completely unjustified is not evidence that the arbitrators exceeded their powers. The Ninth Circuit has clarified that

arbitrators "exceed their powers" only when the award is (1) "completely irrational" or (2) exhibits a "manifest disregard of the law." Kyocera Corp. v. Prudential-Bache Trade Services, Inc., 341 F.3d 987, 997 (9th Cir. 2003). With regard to demonstrating a manifest disregard of the law, "the moving party must show that the arbitrator 'underst[oo]d and correctly state[d] the law, but proceeded] to disregard the same.'" Collins v. D.R. Horton, Inc., 505 F.3d 874, 879 (9th Cir. 2007) (quoting De Navegacion San Maritzme Compania, S.A. v. Saguenay Terminals Ltd., 293 F.2d 796, 801 (9th Cir. 1961)). "[T]here must be some evidence in the record, other than the result, that the arbitrators were aware of the law and intentionally disregarded it." Bosack v. Soward, 586 F.3d 1096, 1104 (9th Cir. 2009) (quoting Lincoln Nat'l Life Ins. Co. v. Payne, 374 F.3d 672, 675 (8th Cir. 2004)).

### 1. Award is not Completely Irrational

"An award is completely irrational only where the arbitration decision fails to draw its essence from the agreement [requiring arbitration]." Lagstein v. Certain Underwriters at Lloyd's, London, 607 F.3d 634, 642 (9th Cir. 2010) (quoting Comedy Club, Inc. v. Improv W. Assocs., 553 F.3d 1277, 1288 (9th Cir. 2009)). "The question is whether the award is 'irrational with respect to the contract, not whether the panel's findings of fact are correct. Whether or not the panels' findings are supported by the evidence in the record is beyond the scope of [this Court].'" Id. at 641. Here, Hu never challenges the panel's authority under the [contractual agreement] or that the panel reached their conclusions in anything resembling an irrational manner. [The contractual agreement] between Regal and Hu clearly mandates arbitration in the event of a dispute. Hu does not assert anything to the contrary, nor could he; Hu only disagrees with the findings and the outcome. This is the exact type of review not permitted by the Court. Thus, because the Award was not completely irrational, this Court denies Hu's petition.

### 2. Panel does not Manifestly Disregard the Law

Manifest disregard of the law means "something more than just an error in the law or a failure on the part of the arbitrators to understand or apply the law. To vacate an arbitration award on this ground, it must be clear from the record that the arbitrators recognized the applicable law and then ignored it." Id. at 641 (internal quotations and citations omitted). "There

must be some evidence in the record, other than the result, that the arbitrators were aware of the law and intentionally disregarded it." <u>Bosack</u>, 586 F.3d at 1104-1105.

Here, Hu points to no evidence that the panel was "aware of the law and intentionally disregarded it." Rather, Hu points only to the result of the arbitration and evidentiary rulings to demonstrate that the FINRA panel purportedly disregarded the law, *see generally* ECF No. 1 at 21-36, which does not justify vacatur under 9 U.S.C. § 10(a)(4). And because Hu has the burden of demonstrating any purported error warranting vacatur, see <u>Gottdiener</u>, 462 F.3d at 110, Hu's failure to identify any error requires the Court to deny his petition.

## V. Attorney's Fees

Having prevailed on Petitioner's Motion to Vacate Arbitration Award and Respondent's removed Motion to Confirm Arbitration Award, the Court awards Respondent attorney's fees and costs in accordance with Nev. Rev. Stat. § 38.243(2). Respondent shall file an application in accordance with Local Rule 54-14.

## VI. Conclusion

Accordingly, IT IS HEREBY ORDERED that Petitioner's Motion to Vacate Arbitration Award (#1) is **DENIED**;

IT IS FURTHER ORDERED that Movant's Motion to Confirm Arbitration Award (#9-2/11) is **GRANTED**;

IT IS FURTHER ORDERED that the Clerk of the Court enter **JUDGMENT** for Respondent and against Petitioner in the amount of $331, 338.43.

Dated this 30th day of September 2020.

     Kent J. Dawson
     United States District Judge